IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
*Southern Division*

| | |
|---|---|
| FADWA SAFAR, | * |
| Plaintiff, | * |
| v. | *     Case No.: GJH-16-3277 |
| | * |
| CORIZON, INC., *et al.*, | * |
| Defendants. | * |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**MEMORANDUM OPINION**

Plaintiff Fadwa Safar alleges that her federal and state constitutional rights were violated by Defendants Corizon Health, Inc. and Nurse Mojisola Adeyemi when she suffered severe pain and distress because she was not given a breastpump to relieve engorged breasts during a three-day detention at the Prince George's County Detention Center. Currently pending before the Court is Defendants' Motion for Summary Judgment, ECF No. 70, which Plaintiff opposed, ECF No. 71. No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2016). For the following reasons, Defendants' Motion for Summary Judgment is granted in part and denied in part.

**I.     BACKGROUND[1]**

    **A. Plaintiff Fadwa Safar's Experience**

Plaintiff Fadwa Safar came to the United States from Iraq in 2008 to escape religious persecution. ECF No. 71-3 ¶ 1. In May 2013, she gave birth to her third and youngest child. *Id.* ¶ 2. To complete her naturalization application, Safar had sought a letter of good standing from local police departments. *Id.* ¶ 5. However, after she went to the Prince George's County Police

---
[1] These facts are either undisputed or viewed in the light most favorable to the Plaintiff as the non-moving party.

1

Department on December 23, 2016, six months after giving birth, she was arrested pursuant to a mistaken arrest warrant and, early in the morning on December 24, 2016, was taken to Prince George's County's Adult Detention Center (ADC). *Id.* ¶¶ 5–6, 9. The arrest warrant stemmed from a mistake made a year earlier when a retailer misread its sales data and alleged that Safar had engaged in credit card fraud. *Id.* ¶ 6. Although the retailer withdrew its allegation against Safar hours after making it, no steps were taken to cancel the related arrest warrant. *Id* Safar remained incarcerated for three days until she was able to appear before a judge after Christmas, at which point the case against her was dismissed. *Id.* ¶¶ 6, 10. She was still breast-feeding her youngest child at the time of this arrest. *Id.* ¶ 6.

Safar was confused and scared, and given that she is a refugee who had previously escaped a "tyrannical regime," she acutely felt the stress of being arrested without cause. *Id.* ¶ 8. By the time she was taken to ADC, she had not expressed milk in almost 24 hours, which caused her breasts to painfully engorge because she was lactating. *Id.* ¶ 12. Engorgement results from unrelieved normal breast fullness. ECF No. 71-5 at 6. As the milk volume increases within the milk producing tissues and is not removed adequately, pressure builds, causing fluid and other milk components to leak into the surrounding tissues ("edema"). *Id.* As fluid shifts from the milk ducts into the tissues, the breasts become swollen, hardened, and red. *Id.*

When her intake photo was taken, Safar's breasts were in pain, ECF No. 71-3 ¶ 15, and the photo shows her clutching them, ECF No. 71-6. She told the corrections officer taking her photo that her breasts hurt because she needed to express milk. ECF No. 71-3 ¶ 16. The officer responded, "this is not my job." *Id.* The corrections officers and medical staff responsible for intake all work in the same room, ECF No. 71-4, and a sign hangs in the facility stating, "If you are ill notify an officer or a nurse," ECF No. 70-11 at 2, 7.

Safar became increasingly stressed by the pain and used an ADC phone within earshot of the intake staff, ECF No. 71-4, to call her family for help, ECF Nos. 71-3 ¶ 17, 71-7 at 2–3. She spoke to her sister-in-law, Basma Zaiber. *Id.* Zaiber had lived in the United States longer than Safar and is naturally more assertive. *Id.* Zaiber told Safar not to worry because she would take care of getting her help expressing milk. ECF No. 71-7 at 3. While Safar continued to seek help from within ADC, she understood that her sister-in-law was also trying to get someone at ADC to help her relieve her pain. ECF No. 71-3 ¶ 18. She approached other corrections officers in the intake area—the same room where her photo was taken and where she used the phone—and told them she needed help "to take the milk out." *Id.* ¶ 19. The officers responded that they could not do anything to help. *Id.*

At this point, more than one corrections officer had dismissed Safar's requests for help, leading her to feel helpless. ECF No. 71-3 ¶ 20. After these interactions with ADC staff, Safar met with Defendant Mojisola Adeyemi, a licensed practice nurse (LPN) who works for Defendant Corizon and is responsible for medical intake screenings of inmates. ECF No. 71-3 ¶ 22. While Adeyemi asked Safar standard intake questions, Safar interrupted to tell her that she had pain and a burning sensation in her breasts. ECF No. 71-3 ¶ 24. Adeyemi responded by directing her to take a pregnancy test. ECF No. 71-3 ¶ 25. Adeyemi asked Safar when her last menstrual period was; and Safar responded that she did not know because she gave birth in May 2013 and was breastfeeding. ECF No. 71- 3 ¶ 28. However, Adeyemi made a notation—inconsistent with Safar's recollection of this encounter—that Safar's last period was in May 2013. ECF No. 71-9 at 1. Adeyemi knows that breastfeeding inhibits menstrual periods, ECF No. 71-2 at 3, but assumed that a delay in an inmate's menstrual period is not cause for concern because she is aware of other situations where it is normal for a young woman to not have a

regular period, including during use of certain forms of contraception, ECF No. 70-7 at 11–12. Adeyemi wrote "no" next to the intake form's question "Recent major surgical history or hospitalization within the past year?" ECF No. 71-9 at 1. When Adeyemi asked Safar if she was on any medications or had any allergies, Safar again interrupted to say that she had pain in her breast and needed help expressing breastmilk. ECF No. 71-3 ¶ 27. Although Safar was experiencing physical distress during the medical screening, *see e.g.*, ECF No. 71-3 ¶ 23–24, there are no notations on her medical intake form regarding her pain or Adeyemi's observation of her physical condition.

Adeyemi does not recall performing Safar's medical intake, ECF No. 71-2 at 4, but she denies that she would have ignored Safar's call for help, ECF No. ECF No. 70-7 at 19. In a similar instance, when a lactating woman advised Adeyemi that she was in pain and needed medical assistance, she reclassified the inmate to the medical unit for care. ECF No. 70-7 at 16. At the end of Safar's medical screening, Safar was in excruciating pain. ECF No. 71-3 ¶ 29. She signed a document, which she does not remember signing, acknowledging that she had provided information to Adeyemi. *Id.* Above the signature line on the form it says, "It has been told and shown to me in writing what to do if I get sick while I am in this facility." ECF No. 70-4 at 2. Nonetheless, Safar claims that she never learned from ADC or Corizon staff about procedures for requesting medical assistance. ECF No. 71-3 ¶ 34.

After Adeyemi finished screening other inmates, Safar tried again to request Adeyemi's help. ECF No. 71-3 ¶ 30. Safar told Adeyemi that she needed help and that, at the suggestion of another inmate, she had tried applying hot water to her breasts but that did not relieve her pain. ECF No. 71-3 ¶ 20, 30. Adeyemi responded that she did not have experience in that area. ECF No. 71-3 ¶ 30.

After these fruitless attempts to get help, Safar was demoralized. ECF No. 71-3 ¶ 31. She was then transferred to a locked cell. ECF No. 71-3 ¶ 32. From that point on, she relied on her family to get her help. ECF No. 71-3 ¶ 35. Safar's sister-in-law, Basma Zaiber, came to the detention center with Safar's criminal defense attorney and spoke with a corrections officer sitting at the reception desk. ECF No. 71-7 at 5. They explained that Safar was in physical distress and needed a breastpump but were told that the facility did not have one and that Zaiber could not bring her one because a breastpump would not be allowed into the facility. *Id.* The corrections officer told Zaiber that she could contact the medical unit for further assistance. ECF No. 71-7 at 6. Zaiber then repeatedly called the medical unit on December 24 and 25. *Id*; ECF No. 71-13. The first time Zaiber called the medical unit, she explained that her sister-in-law was incarcerated, in pain, and needed a breastpump. ECF No. 71-7 at 7. Zaiber felt that the woman answering the phone was disinterested—she did not even ask for Safar's name—and that nothing would be done to resolve Safar's issue. *Id.* 7–8. The next time Zaiber called, she spoke with a different person who told her "I don't think I saw anyone complaining or crying" in response to Zaiber's plea that someone help relieve Safar's pain. ECF No. 71-7 at 8. No one in the medical unit contacted Safar in response to Zaiber's calls. ECF No. 71-3 ¶ 36.

On December 26, 2016, when Safar was released from custody around 4:30pm, her breasts had been engorged and causing her physical distress for approximately 56 hours. ECF No. 71-3 ¶ 37. As fluid accumulates in the breast, more pressure is placed on the milk producing tissue, making removal of breastmilk more difficult ("milk stasis"), and causing unrelieved pain. ECF No. 71-5 at 6. Because she could not express milk while incarcerated, Safar suffered milk stasis. *Id.* After her incarceration, Safar was able to nurse her baby for a brief period, but "a combination of reduced flow, nausea, and psychological blockage" led her to stop. *Id.* She had

5

breastfed her other children until they were each two-years old without incident, and she planned to continue to breastfeed her youngest child until he turned two. ECF No. 71-3 ¶ 3. But after her incarceration she was unable to continue feeding her son as she had planned, which caused her great distress. ECF No. 71-3 ¶ 38.

### B. Defendant Corizon's Policies

In general, when an inmate is brought to the Prince George's County ADC, a Corizon nurse interviews the inmate before she is taken to a cell. ECF No. 70-5 at 3. Corizon nurses ask a series of standardized questions, perform tests, and observe an inmate's condition during medical screenings but do not do physical examinations. ECF No. 70-7 at 6–7. Female inmates are asked about their menstrual cycle and required to take a pregnancy test, but the medical intake form does not include questions about lactation. *See* ECF No. 70-7 at 6 & 11. When the medical intake form is complete, a printout is provided to the inmate to review and sign after confirming the accuracy of the information. ECF No. 70-7 8–9.

ADC and Corizon have a policy by which inmates may be provided with outside medical devices. ECF No. 70-5 at 5. An inmate or third party can come in with the device, or an inmate may request one during the medical screening. *Id.* Then the medical administrator or medical director determines whether the request is legitimate. *Id.*; ECF No. 70-8 at 3. When medical staff is advised by an inmate that a family member or third party is bringing the medical device to the Detention Center, the medical provider informs Corizon's administrative assistant who is bringing the device and then corresponds with the doctor and the Health Services Administrator. ECF No. 70-9 at 2–3. The assistant then contacts security by telephone and email for approval of the device. ECF No. 70-9 at 3; *see also* ECF No. 70-8 at 5. When the assistant is not working, the Director of Nursing covers contacting security about medical devices. ECF No. 70-9 at 5.

In addition to allowing outside medical devices into the facility, Corizon also maintains an inventory of medical devices. ECF No. 70-8 at 3; ECF No. 70-9 at 4. If an inmate requires a specific medical device that is not available at the facility, Corizon will order it for the inmate. *Id.* Corizon contends that inmates have been provided with breastpumps in the past. ECF No. 71-1 at 3. Corizon's corporate designee testified that he has seen inmate medical records with notations referencing that the inmate is breastfeeding, and he has seen breastmilk in the ADC freezer. ECF No. 71-1 at 3–4.

Finally, cells are outfitted with an intercom that transmits directly to the guard station within the housing unit. ECF No. 70-11 ¶ 8. The intercom at the guard's station does not stop ringing until a guard answers the call. *Id.* The guards have sick-call forms at their station and can provide them to any inmate who requests medical attention ECF No. 70-11 ¶ 9. If a detainee calls the guard's station and states that she is sick or in pain, it is ADC policy for the guard to either provide the detainee with a sick call slip or transport the detainee to the medical unit. *Id.*

## II. STANDARD OF REVIEW

Summary judgment is proper if there are no issues of material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Francis v. Booz, Allen & Hamilton, Inc.,* 452 F.3d 299, 302 (4th Cir. 2006). A material fact is one that "might affect the outcome of the suit under the governing law." *Spriggs v. Diamond Auto Glass,* 242 F.3d 179, 183 (4th Cir.2001) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, (1986)). A dispute of material fact is only "genuine" if sufficient evidence favoring the non-moving party exists for the trier of fact to return a verdict for that party. *Anderson,* 477 U.S. at 248–49. However, the nonmoving party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy,* 769

F.2d 213, 214 (4th Cir.1985). The Court may rely on only facts supported in the record, not simply assertions in the pleadings, to fulfill its "affirmative obligation . . . to prevent 'factually unsupported claims or defenses' from proceeding to trial." *Felty v. Graves–Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir.1987). When ruling on a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Anderson,* 477 U.S. at 255.

## III. DISCUSSION

The Eighth Amendment's prohibition against cruel and unusual punishment was made applicable to the States by the Fourteenth Amendment. *Estelle v. Gamble* 429 U.S. 97, 101 (1976). Among other indignities, the Eighth Amendment forbids punishment that involves "the unnecessary and wanton infliction of pain." *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). The Supreme Court has made clear that "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." *Estelle*, 429 U.S. at 104 (internal citations omitted).

Based on three theories, Plaintiff claims that Defendants were deliberately indifferent to her serious medical need in violation of the Fourteenth Amendment of the U.S. Constitution and Article 24 of the Maryland Declaration of Rights.[2] First, Plaintiff alleges that Adeyemi was deliberately indifferent when she did nothing after Safar told her she was in pain and needed to express breastmilk. Although Plaintiff acknowledges that Defendant Corizon cannot be held liable under a *respondeat superior* theory for Adeyemi's alleged violations of Safar's Fourteenth Amendment rights, she alleges that Corizon is liable for Adeyemi's purported violations of

---

[2]"Article 24 and the Fourteenth Amendment of the U.S. Constitution are construed as parallel with each other." *Robles v. Prince George's Cty*, 302 F.3d 262, 272 (4th Cir. 2002).

8

Maryland law under *respondeat superior*.³ Second, Plaintiff claims that Corizon's policy or custom regarding providing breastpumps to inmates caused Adeyemi's deliberate indifference. Finally, Plaintiff alleges that Defendant Corizon was deliberately indifferent by failing to train its staff on providing breastpumps to lactating inmates. Defendants seek summary judgment on each of Plaintiff's claims. For the reasons discussed below, fact issues preclude summary judgment on whether Adeyemi was deliberately indifferent, but insufficient facts support Plaintiff's policy or custom and failure to train theories such that Defendants are entitled to summary judgment on those claims.

### A. Deliberate Indifference: Adeyemi's lack of action

A defendant is deliberately indifferent to an inmate's serious medical needs in violation of the Fourteenth Amendment of the U.S. Constitution and Article 24 of the Maryland Declaration of Rights if the defendant "acted or failed to act despite his knowledge of a substantial risk of harm." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). A deprivation must be "sufficiently serious" to trigger liability, *id.* at 834, but Defendants here have conceded that the need to express breastmilk is an objectively seriously medical condition within *Farmer's* meaning. *See* ECF No. 70-1 at 20–22. Still, for liability to attach, a prison official must have "a state of mind more blameworthy than negligence." 511 U.S. at 835. Though "deliberate indifference is more than mere negligence," it is "less than acts or omissions done for the very purpose of causing harm or with knowledge that harm will result." *Scinto v. Stansberry*, 841 F. 3d 219, 226 (4th Cir. 2016) (internal citations omitted). "Whether an official had the requisite knowledge is a question of fact subject to demonstration in the usual ways, and a factfinder may conclude that the official knew of a substantial risk from the very fact that it was obvious." 511

---

³ *Respondeat superior* liability does attach for violations of the Maryland Declaration of Rights. *DiPino v. Davis*, 354 Md. 18, 51 (MD Ct. of App. 1999).

U.S. at 826. "[A] prison official's failure to respond to an inmate's known medical needs raises an inference of deliberate indifference to those needs." *Scinto v. Stansberry*, 841 F. 3d 219, 226 (4th Cir. 2016) (internal citations omitted) (denying summary judgment where record showed that prison doctor knew of plaintiff's diabetes but denied him insulin); *see also Goebert v. Lee County*, 510 F.3d 1312, 1327–28, 1331 (11th Cir. 2007) (denying summary judgment where a jury could find that disregarding pregnant inmate's complaint that she was leaking fluid constituted deliberate indifference).

Whether Adeyemi knew that Safar was in physical distress and needed to express breastmilk but recklessly chose to do nothing is, at the very least, a disputed issue that must be left to a jury. Safar recalls being in physical distress during intake and asking for Adeyemi's help at least four times. *Id.* She remembers that Adeyemi did nothing to relieve her pain. ECF No. 71-3 ¶ 30. Despite Safar's physical condition and requests for help, Adeyemi did not ask follow-up questions; she did not make any notations about Safar's pain on the medical intake form; she did not explain the process for requesting medical assistance or obtaining a medical device; and she did not take any steps to get Safar access to a breastpump. Adeyemi took no action even though she testified that in a similar instance, when a lactating woman advised her that she was in pain and needed medical assistance, she reclassified the inmate to the medical unit for care. ECF No. 70-7 at 16. Adeyemi simply does not recall Safar's medical intake and cannot specifically dispute Safar's recollection. ECF No. 71-2 at 4. It would be reasonable for a jury to conclude that Safar remembers these events, while Adeyemi does not, because for Safar they were painful and frustrating while for Adeyemi they were routine. Viewing the facts in the light most favorable to

Safar, this evidence establishes that Adeyemi failed to respond to Safar's known medical needs and raises an inference of deliberate indifference to those needs. *Scinto*, 841 F. 3d at 226.[4]

To be sure, a jury might also find that Adeyemi was only negligent and that her failure to help Safar access a breastpump was not the result of deliberate indifference. As Defendants point out, Adeyemi's practice is to accurately complete the medical intake form based on the information provided by the inmate. ECF No. 70-7 at 19. And Safar signed a document acknowledging that she had been told what to do if she got sick while at ADC. ECF No. 70-4 at 2; ECF No. 71-3 ¶ 29. Thus, a factfinder could deem Safar's testimony not credible, choosing instead to believe that Adeyemi did not include a notation about Safar's need to express breastmilk on the medical intake form because Safar never sufficiently communicated this request. However, that certain facts support Adeyemi's version of events simply does not entitle Defendants to summary judgment; instead, here, where other facts support Safar's claim, it only means that genuine issues of material fact remain.

Defendants' argument that summary judgment is warranted because Safar never specifically asked for a breastpump is unpersuasive. During their encounter, Safar told Adeyemi that she had given birth six months prior, that she was breastfeeding, that her breasts were in pain, that she had a "problem" with her breasts because they were "filled with the milk," and that she needed help removing the milk. ECF No. 71-3 ¶¶ 25, 27, 28. Defendants' view that a prison official can be held liable for deliberate indifference only if an inmate uses a magic word (in this case, breastpump) is inconsistent with precedent and common sense. *See* 511 U.S. at 842

---

[4] Even if jurors deem Safar's testimony that she requested Adeyemi's help four times not credible, other evidence exists from which they could conclude that Adeyemi was deliberately indifferent. For example, Safar told Adeyemi that she did not know when her last menstrual period was because she gave birth in May 2013 and was breastfeeding. ECF No. 71-3 ¶ 28. Instead of clarifying whether Safar would need access to a breastpump, Adeyemi made the inaccurate notation on the medical intake form that Safar's last period was in May 2013. ECF No. 71- 3 ¶ 28. Moreover, a jury could find that Adeyemi "knew of a substantial risk from the very fact that it was obvious," 511 U.S. at 826, because Safar looked like she was in physical distress. ECF No. 71-6 (Safar's intake photo shows her clutching her breasts in pain).

("whether an official had the requisite knowledge is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence"). The unreasonableness of a magic-words approach is particularly on display in this case where the Plaintiff is a refugee who speaks English as a second language, ECF No. 71-3 ¶ 1, was under the stress of a mistaken arrest, *id.* ¶ 8, was experiencing significant physical pain, *id.* ¶ 15, felt helpless after ADC corrections officers denied her help, *id.* ¶ 20, and still managed to seek help from Adeyemi, ECF No. 71-3 ¶¶ 23–30.

Defendants attempt unsuccessfully, at this stage in the litigation, to shift blame for Safar's injury onto the Plaintiff by asserting that her "failure to act affirmatively to seek medical care following her medical intake screening is an intervening cause of her claimed injury." ECF No. 70-1 at 23. This defense fails because "the question of whether causation is proximate or superseding is a matter to be resolved by the jury." *McGuiness v. Brink's Inc.*, 60 F. Supp. 2d 496, 498 (D. Md. 1999) (applying Maryland law). "Only if the evidence can lead to no other conclusion, can the matter" of causation "be decided as a matter of law." *Id.* At the point when Safar stopped asking for help herself, she knew that her sister-in-law was seeking help on her behalf. ECF No. 71-3 ¶ 17–18; ECF No. 71-7 at 2–3. Zaiber did in fact try to get Safar help after Safar's medical intake but was also unsuccessful. ECF No. 71-7 at 6; ECF No. 71-13.

In sum, genuine disputes of material fact remain regarding whether Adeyemi was deliberately indifferent to Safar's serious medical need, and Defendants' motion for summary judgment will be denied on Plaintiff's Fourteenth Amendment claim as to Defendant Adeyemi and Plaintiff's Maryland Declaration of Rights claims as to both Defendants.

### B. Deliberate Indifference: Policy or Custom

Next the Court must determine if summary judgment is appropriate on Plaintiff's claim that a Corizon policy, or lack thereof, caused Safar's constitutional deprivation of adequate medical care. "Although the 'principles of § 1983 policy-maker liability were articulated in the context of suits brought against municipalities and other local government defendants,' they 'are equally applicable to a private corporation acting under color of law when an employee exercises final policymaking authority concerning an action that allegedly causes a deprivation of federal rights'" *Brondas v. Corizon Health, Inc.,* 7:14-CV-00369, 2015 U.S. Dist. LEXIS 71921 at *12-13 (W.D.Va. June 3, 2015) (citing *Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 728 (4th Cir. 1999). Corizon has not disputed that in providing medical services to pre-trial detainees it was acting under color of law. *See also Fields v. Corizon Health, Inc.*, 490 Fed. Appx. 174, 181-182 (11th Cir. 2012) (finding that private entity providing medical services to inmates served a state function and could be held liable under § 1983); *Natale v. Camden County Correctional Facility,* 318 F.3d 575, 581 (3rd Cir. 2003) ("It is undisputed that [New Jersey's Prison Health Services, PHS] was acting under color of state law when it provided medical services to [an inmate]"). Thus, the Court will analyze Corizon's liability as it would the liability of a municipal employer.

"An official policy often refers to formal rules or understandings that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time." *Semple v. City of Moundsville*, 195, F.3d 708, 712 (4th Cir. 1999) (internal citations omitted). However, a policy may arise outside of "formal decisonmaking channels" if "a practice is so 'persistent and widespread' and 'so permanent and well settled as to constitute a 'custom or usage'" *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999) (quoting *Monell v. Dep't. of Soc. Servs.*, 436 U.S. 659, 691 (1978)). "It does not matter if the policy was duly enacted or

written down, nor does it matter if the policy counsels aggressive intervention into a particular matter or a hands-off approach." *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 379 (7th Cir. 2017), *cert. denied Corr. Med. Servs., Inc. v. Glisson*, 138 S. Ct. 109 (2017); *see also Long v. Cty. of Los Angeles*, 442 F.3d 1178 (9th Cir. 2006). In distinguishing between "episodic exercises of discretion," 195 F.3d at 712, and conscious policy decisions, the critical question is whether "the action about which the plaintiff is complaining [is] one of the institution itself, or is [] merely one undertaken by a subordinate actor." 849 F.3d at 379. A "conscious decision not to take action" can "be proven in a number of ways, including but not limited to repeated actions." *Id.* An institution's failure to take corrective action after repeated wrongdoing creates an inference of "supervisory indifference" and suggests "tacit authorization of subordinates' misconduct may" have caused "the constitutional injuries" inflicted on those committed to an institution's care. *Slakan v. Porter,* 737 F.2d 368, 372 (4th Cir.1984).

Even viewing the facts in the light most favorable to Safar, the record does not contain sufficient evidence to transform the relevant "episodic exercises of discretion" by subordinates into a "conscious decision not to take action" by the institution. Although the record shows that Adeyemi ignored Safar's multiple requests for help, ECF No. 71-3 at 24–30, it does not reveal "repeated actions" by the institution. It is not clear from the record who disregarded Zaiber's multiple requests that someone help relieve Safar's pain. ECF Nos. 71-7 ¶¶ 7–8, 71-3 ¶ 36. Without more details, a finder of fact would be unable to conclude that Zaiber's interactions with Corizon staff were the result of a Corizon policy rather than improper exercises of discretion by individual employees. Further, the record does not indicate that Corizon was aware of Safar's lack of access to a breastpump and failed to take corrective action. Thus, no inference of

14

"supervisory indifference" or "tacit authorization of subordinates' misconduct" can be drawn from the evidence.

Rather than including examples of repeated failures by Corizon to assist lactating inmates, the record indicates that the institution has responded appropriately in the past to breastfeeding detainees. For example, Adeyemi recalls that in a similar instance, when a lactating woman advised her that she was in pain and needed medical assistance, she reclassified the inmate to the medical unit for care. ECF No. 70-7 at 16. Similarly, Corizon's corporate designee testified that he has seen inmate medical records with notations referencing that the inmate is breastfeeding, and he has seen breastmilk in the ADC freezer. ECF No. 71-1 at 3–4.

Corizon's broader medical device policy also proves that Adeyemi's failure to assist Safar constituted a discrete incident, not a conscious decision based on a custom of denying lactating inmates access to breastpumps. Inmates may be provided with outside medical devices, including breastpumps if the inmate or a third party brings the device or the inmate requests one during the medical screening. ECF No. 70-5 at 5. When medical staff is advised by an inmate that a family member or third party is bringing the medical device to the Detention Center, the medical provider informs Corizon's administrative assistant who is bringing the device and then corresponds with the doctor and the Health Services Administrator. ECF No. 70-9 at 2–3. The assistant then contacts security by telephone and email for approval of the device. ECF No. 70-9 at 3; *see also* ECF No. 70-8 at 5. When the assistant is not working, the Director of Nursing covers contacting security about medical devices. ECF No. 70-9 at 5. Although a jury might find that Adeyemi failed to adhere to this policy and acted with deliberate indifference towards Safar, a jury could not conclude from these facts that Corizon lacked a coherent policy for assisting lactating detainees.

15

Because no genuine disputes of material fact remain, Defendant's Motion for Summary Judgment on Plaintiff's claim that Corizon's policies and customs led to deliberate indifference towards Safar's Fourteenth Amendment and Article 24 rights will be granted.

### C. Deliberate Indifference: Failure to Train

To establish a claim based on a failure to train, Plaintiff must demonstrate "(1) the nature of the training, (2) that the training was a 'deliberate or conscious' choice by the municipality, and (3) that the [employee's] conduct resulted from said training." *See Lewis v. Simms*, No. 11–2172, 2012 W L 254024 at * 3 (D. Md. Jan. 26, 2012) (citing *Drewry v. Stevenson*, No. 09–2340, 2010 WL 93268 at * 4 (D. Md. Jan. 6, 2010)). In resolving liability, "the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform." 489 U.S. at 390. "That a particular" employee "may be unsatisfactorily trained will not alone suffice to fasten liability" on the employer because the "shortcomings may have resulted from factors other than a faulty training program." *Id.* at 390–91.

Here, Plaintiff does not point to evidence in the record that sheds light on the nature of Corizon's general training. Although Adeyemi told Plaintiff that she did not have the experience to help her, without facts about the nature of Corizon's training program, a factfinder would be unable to conclude that the inadequacy of Corizon's training led to Adeyemi's shortcomings. Further, evidence that Adeyemi alone may have been unsatisfactorily trained is not sufficient to create a triable issue. And although other evidence exists to suggest that additional Corizon employees ignored Safer's requests for help through her sister-in-law, these facts do not indicate that the employees lacked training the way Adeyemi's "I do not have experience" comment might; instead the responses Zaiber heard from the medical unit employees suggested that the employees were disinterested in helping. As a result, Plaintiff can only point to Adeyemi's

comment regarding her lack of experience in support of her failure to train claim, and evidence "that a particular" employee may be inadequately trained is not enough to survive a motion for summary judgment.

Because insufficient evidence exists to support Plaintiff's failure to train theory, Defendants' Motion for Summary Judgment will be granted as to this claim.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment is granted in part and denied in part. A separate Order shall issue.

Date: December 11, 2018                         /s/
                                              GEORGE J. HAZEL
                                              United States District Judge